UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

---

ERNEST BOWMAN,

               Petitioner,

   – against –

SUPERINTENDENT WILLIAM LEE,

               Respondent.

**MEMORANDUM & ORDER**

10-CV-0951 (ERK)

---

KORMAN, *J*.:

      I assume familiarity with the underlying facts and circumstances of this case. Briefly, petitioner Ernest Bowman approached Juan Manuel Olivera, pushed him to the ground, pointed a firearm at him, and demanded money. Olivera gave Bowman $100, and Bowman fled the scene of the crime. A friend of Olivera's, with whom Olivera had discussed the crime and Bowman's physical appearance, later recognized Bowman and notified Olivera. Olivera then notified the police, and Bowman was apprehended. Bowman was convicted by jury trial in Queens County of robbery in the first degree.

      Bowman initially advanced four arguments in support of his petition for habeas corpus: a *Batson* violation, denial of his right to confrontation, prosecutorial misconduct, and ineffective assistance of counsel. I previously denied the petition with respect to all grounds raised except for the *Batson* claims. *See Bowman v. Lee*, No. 10-CV-951 (ERK), 2013 WL 5423779 (E.D.N.Y. Sept. 26, 2013). On that issue, I appointed counsel to represent petitioner. *Id.* After an extensive briefing and oral argument, I am ready to decide the issue.

**BACKGROUND**

Bowman argues that the trial judge and the Appellate Division erred by rejecting his claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), after the Assistant District Attorney used his peremptory challenges to strike four of the five black prospective jurors in the venire pool. Before addressing each of peremptory challenges as they occurred in the context of jury selection, it would be helpful to provide an overview of the applicable law, particularly as it relates to the resolution of this issue in a habeas corpus proceeding.

**A.      An Overview of the Applicable Law**

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Courts weighing a *Batson* challenge follow a three-stage inquiry:

> A *Batson* objection may be lodged when a party perceives a pattern of discrimination in the use of peremptory strikes during the voir dire, so-called "step one" or the "prima facie case" of a *Batson* challenge. Step two requires that, upon a showing of a pattern of discrimination, the opposing party provide race neutral reasons for its peremptory strikes. Finally, step three returns the ball to the challenger, who must then show that the professed race neutral reasons were pretextual and prove racial discrimination was the real motive.

*Richardson v. Greene*, 497 F.3d 212, 214 (2d Cir. 2007). During the third step, "the trial court considers the totality of the circumstances to determine whether the objecting party has carried its burden of proving purposeful discrimination by a preponderance of the evidence." *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010). Throughout this process, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

When ruling on a *Batson* challenge at the third step, a trial court must make clear "whether it credits the non-moving party's race-neutral explanation for striking the relevant

panelist." *Dolphy v. Mantello*, 552 F.3d 236, 239 (2d Cir. 2009) (internal quotation omitted); *United States v. Thomas*, 320 F.3d 315, 320 (2d Cir. 2003); *Galarza v. Keane*, 252 F.3d 630, 636 (2d Cir. 2001). This can be done by confirming the accuracy of the prosecutor's observations or finding that the proffered explanation reflects the prosecutor's good faith belief. *Thomas*, 320 F.3d at 320. Where the trial judge engages in only a perfunctory *Batson* inquiry and does not conduct a meaningful inquiry into the question of discrimination, the letter and spirit of *Batson* have been violated and habeas is appropriately granted. *Jordan v. Lefevre*, 206 F.3d 196, 201-02 (2d Cir. 2000). The trial court need not, however, "engage in a talismanic recitation of specific words in order to satisfy *Batson*" so long as it generally credits the non-moving party's race-neutral explanation. *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006); *Reyes v. Greiner*, 340 F. Supp. 2d 245, 253 n.1 (E.D.N.Y. 2004). "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Messiah*, 435 F.3d at 198.

A trial judge's decisions on such context-specific matters of credibility are generally entitled to a high degree of deference. The Supreme Court's reasoning on the matter is instructive:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez v. New York*, 500 U.S. 352, 365 (1991) (internal citations omitted). More recently, the Supreme Court has emphasized that perhaps greater deference is due to the trial judge's determination of credibility when challenged in a petition for a writ of habeas corpus. After

reiterating that the *Batson* issue turns largely on an evaluation of credibility and that the trial judge's determination is entitled to great deference which "must be sustained unless it is clearly erroneous," the Supreme Court reminded the Ninth Circuit that that "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594 (2011) (internal quotation omitted). Indeed, the Ninth Circuit has since described that standard as "doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

Against this backdrop, I turn to the events giving rise to petitioner's claim.

**B.      Factual Background**

1.      Jury Selection

Jury selection took place on April 7, 2005. Jurors were questioned in panels of seventeen. At the end of the first round, petitioner's counsel, Steven Sternberg, expressed a potential *Batson* issue based on the prosecutor's striking both black prospective jurors from the panel, although he did not make an official challenge at that point. Voir Dire Tr. Apr. 7, 2005, 80-81, ECF No. 17-4 (Page ID #596-97). During the colloquy surrounding the second round, Sternberg officially lodged a *Batson* challenge after the prosecution used peremptory challenges against two of the three black prospective jurors in that round. *Id.* at 145-46 (Page ID #661-62). The trial judge found that the defendant had made a sufficient showing under *Batson* to require the prosecutor, Patrick O'Connor, to explain his challenges to the four jurors: Denise Chatman, Norene Thomas, Troy Johnson, and Dain France. *Id.* at 146-47 (Page ID #662-63). Because *Batson* inquiries are necessarily fact intensive, I quote extensively below from the record as it relates to each juror.

*a.*      *Denise Chatman*

Denise Chatman was a member of the first panel called in for voir dire.  She engaged in the following introductory colloquy with the trial judge:

| | |
|---|---|
| The Court: | Miss Chatman, married or single? |
| Chatman: | Divorced. |
| The Court: | What part of the county do you live in? |
| Chatman: | St. Albans. |
| The Court: | What do you do? |
| Chatman: | I work at Village Nursing Home as a nurse assistant in the rehab department. |
| Sternberg: | I didn't get any of that. |
| The Court: | Please repeat what you just stated. |
| Chatman: | I work at Village Nursing Home as a nurse assistant in the rehab department. |
| The Court: | Do you have children? |
| Chatman: | Yes, four. |
| The Court: | What sorts of things are they doing? |
| Chatman: | One works at Kennedy Airport, one works at Norfork Bank, one works for Toyota, one works for the Board of Ed. |
| The Court: | Department of Ed. |
| Chatman: | Yes. |
| The Court: | I have two family members who wish they were working for the Board of Ed instead of the Department of Ed.  Your level of education? |
| Chatman: | High school. |

*Id.* at 37-38 (Page ID #553-54).  During his time to address the jury, the prosecutor asked Ms.

Chatman two brief questions:

> O'Connor:       Miss Chatman, what did your husband do before you were divorced from him?
>
> Chatman:       Peace officer for the Brooklyn Public Library.
>
> O'Connor:       How long have you worked as a nursing assistant?
>
> Chatman:       20 years.

*Id.* at 56 (Page ID #572).  Defense counsel interacted only briefly with Ms. Chatman, asking one

question:

> Sternberg:       [The judge] also told you, and I am trying to get some assurance from all of you that if [Bowman] does not testify in this case that you will not hold that against him? . . . Miss Chatman, can I have your assurance on that?
>
> Chatman:       Yes.

*Id.* at 73 (Page ID #589).

The prosecutor explained his use of a peremptory strike against Ms. Chatman by saying:

> Miss Chatman one she was number one and she would be the foreperson of this jury and given her stance and when I say stance the way she was positioned when she was sitting, the way she responded to defense counsel's questions, the way she responded to my questions and her general manner made me feel very uncomfortable.

*Id.* at 148-49 (Page ID #664-65).  When pressed by the trial judge to be more specific, he

answered:

> O'Connor:       That's the rationale for why I struck her, your Honor. I just did not feel comfortable with her.  I did not feel comfortable with her responses to defense counsel.  She took an attitude with him when he asked her I believe to raise her voice at one point and she in a very indignant manner said I'm a nursing assistant.

| The Court: | Well, the first time she answered Mr. Sternberg said he didn't hear so I asked her to speak louder and she did. |
|---|---|
| O'Connor: | The way she did it, your Honor, when she did it she glared at Mr. Sternberg and said in a very forceful manner which clearly indicated to me that she was perturbed with him. Also as she was sitting there and unlike the other jurors when you were talking with the other jurors and instructing them on the law and asking questions she was not just listening, she was looking around, perched on the edge of her seat. If she was perhaps another juror perhaps not the foreperson to be on the jury I would not have had a problem for those reasons. |

*Id.* at 149-50 (Page ID #665-66).

The trial judge characterized the prosecutor's argument as "essentially a body language argument" and said he had not interpreted Ms. Chatman's responses as hostile. *Id.* Defense counsel called the prosecutor's explanation his "weakest argument" and asserted that "none of [the reasons] are valid and overcome his burden of showing that they were racially neutral."[1] *Id.* at 152 (Page ID #668). He reiterated that Ms. Chatman should be seated on the jury. *Id.*

*b.    Norene Thomas*

Norene Thomas was also called in the first panel for voir dire. Her first interaction with the trial judge arose as the judge inquired as to the prospective jurors' connections to law enforcement:

| The Court: | Do you or any members of your family work for law enforcement in any capacity, police, DA, FBI, corrections or do you or any of your family try cases more specifically criminal cases? Miss Thomas? |
|---|---|

---

[1] I add a brief note to observe that this is a misstatement of the applicable legal standard. The prosecutor's burden is merely to provide a facially race neutral explanation for his strike. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. It is the defendant in this case who bore the burden of showing that race motivated the strike; the prosecutor did not have to prove that race was not the motivation.

| Thomas: | My husband is chief of Correction and I'm the director of nursing at Corrections. |
|---|---|
| The Court: | You both work at Rikers? |
| Thomas: | Yes. |
| The Court: | How long have you been doing that? |
| Thomas: | 1986. |
| The Court: | Testing my math skills? Based on that no doubt you have had a lot of exposure to a lot of different things. Do you think that will affect your ability to sit as a fair juror? |
| Thomas: | No. |

*Id.* at 21 (Page ID #538). Ms. Thomas spoke up again when the trial judge asked about anyone

who had a conflict with law enforcement either personally or through a family member:

| Thomas: | My son was arrested for drunk driving. |
|---|---|
| The Court: | In Queens? |
| Thomas: | Yes. |
| The Court: | How long ago? |
| Thomas: | Seven years. |
| The Court: | Was that resolved before trial or did it go to trial? |
| Thomas: | He did two months. I don't know. |
| The Court: | Did he take a plea? |
| Thomas: | No, he didn't take a plea. |
| The Court: | So the case went to trial? |
| Thomas: | No, he just stood before the judge and they told us two months. There was no trial. |
| The Court: | It was likely resolved with plea negotiations before trial. |

8

| | |
|---|---|
| Thomas: | Probably. |
| The Court: | Would that affect your ability to listen to the evidence? |
| Thomas: | Yes, no problem. |

*Id.* at 24 (Page ID #540). The trial judge later engaged in the following colloquy with Ms. Thomas:

| | |
|---|---|
| The Court: | Miss Thomas, you are married to the gentleman who works at Rikers with you, correct? |
| Thomas: | Correct. |
| The Court: | I do pay some attention. What part of the county do you live in? |
| Thomas: | Queens Village. |
| The Court: | You are employed, and your husband? |
| Thomas: | My husband is chief of department at Rikers Island. |
| The Court: | Any children? |
| Thomas: | Yes, eight. |
| The Court: | What sort of things are they [doing]? It's a good refresher course. |
| Thomas: | The oldest one is a financial analyst. The second one is a physical therapist. Three are in high school, two at Christ the King, one at St. John's Prep and my grandson who is eight is at St. John's. |
| The Court: | Your level of education? |
| Thomas: | College. |

*Id.* at 41-42 (Page ID #557-58).

During the lawyers' time to address the jury, the prosecutor asked two questions of Ms. Thomas:

| | |
|---|---|
| O'Connor: | Miss Thomas, you stated that your son, I was a little confused, you said it didn't go to trial, there was no witnesses or testimony or anything like that? But you are unsure whether or not he took a plea or not? |
| Thomas: | If he did, the lawyer didn't explain that to us, so all I know we went a few times and each time they said come back, and then finally after two years of coming back they said okay, remand, and he did two and a half months. |
| O'Connor: | Was this in Queens? |
| Thomas: | Yes. |

*Id.* at 58 (Page ID #574). Defense counsel used part of his time to discuss the evaluation of a witness's credibility:

| | |
|---|---|
| Sternberg: | Miss Thomas, you have eight children. At any point in their lives or in your career as a parent, have any of the eight lied to you? |
| Thomas: | Sure. |
| Sternberg: | How did you know that? |
| Thomas: | Cause you know your children is the first thing, and by their reactions and demeanor or because they just want to do or say something to get away with, I know certain things they will lie about. |
| Sternberg: | Part of what you mentioned you will use as tools in this case if you are picked as a juror? |
| Thomas: | I think so. |
| Sternberg: | But you have already told us I guess by not raising your hands you don't recognize any of the names in this case. |
| Thomas: | Yes. |
| Sternberg: | Not the same as evaluating your child, right, these are strangers to you? |
| Thomas: | Right. |

| Sternberg: | Would you agree with me it's easier a little easier or a lot easier to check out whether your child, someone you know if telling you the truth and whether a stranger is telling you the truth. |
| Thomas: | I would agree with that. |
| Sternberg: | What other tools are you going to use? |
| Thomas: | Fair and impartial. |

*Id.* at 67-68 (Page ID #583-84).

The prosecutor offered two reasons for his decision to strike Ms. Thomas from the jury. First, he explained that she seemed uncertain as to the resolution of her son's DUI case despite her stated involvement in the case for some period of time. *Id.* at 148 (Page ID #664). O'Connor said, "that leads me to believe that there is something wrong with this woman, she has been going to this case with her son for a long period and is unclear about the results." *Id.* Further, the prosecutor said he struck Ms. Thomas because

> she works in the criminal justice system at Rikers Island on a daily basis along with her husband and my personal belief I do not put correction officers and people with extended contacts with the correction system on my jury because of the possibility that they would be disinclined to convict anyone knowing the conditions inside of a prison. . . . I just wouldn't want anyone like that.

*Id.* He also highlighted that he had likewise struck a non-minority juror from the panel "who [had] been in prison several times visiting people helping prisoners." *Id.*

Defense counsel argued that the prosecutor was "totally speculating" in saying that something was wrong with Ms. Thomas, particularly given her responsible position. *Id.* at 152 (Page ID #668). But when the trial judge pointed out that the prosecutor's primary argument seemed to be about the level of empathy a juror would feel given extensive contacts with the prison system, Sternberg replied, "Okay" and moved on to his argument regarding Ms. Chatman. *Id.*

*c.* *Troy Johnson*

Troy Johnson sat in the second panel of jurors questioned. He engaged in the following introductory colloquy with the trial judge:

> The Court: Mr. Johnson, are you married or single?
>
> Johnson: Single.
>
> The Court: What part of the county?
>
> Johnson: Astoria, supervisor of the New York City housing authority.
>
> The Court: Your level of education?
>
> Johnson: High school.

*Id.* at 121-22 (Page ID #637-38). During questioning about interactions with law enforcement, Mr. Johnson spoke up:

> The Court: Have you or any members of the family ever had a conflict with the law, arrested, prosecuted for anything other than a parking ticket? Mr. Johnson.
>
> Johnson: My nephew.
>
> The Court: Was charged?
>
> Johnson: It was a big brawl fight and someone got stabbed.
>
> The Court: He was charged with assault?
>
> Johnson: Yes.
>
> The Court: Was that in Queens County?
>
> Johnson: No, Manhattan about four or five years ago.
>
> The Court: Did the case go to trial?
>
> Johnson: I believe it was resolved before trial.
>
> The Court: Anything about that experience you think might affect your ability to be fair?

|          |      |
|----------|------|
| Johnson: | No.  |

*Id.* at 98-99 (Page ID #614-15).

Defense counsel questioned Mr. Johnson on whether he had interactions with the police through his work:

| Sternberg: | Mr. Johnson, you indicated you are a supervisor in Housing Authority, what are your responsibilities? |
|------------|----|
| Johnson: | Caretakers and maintenance of the buildings, and maintaining the building. |
| Sternberg: | Do you have any problems where you have to call law enforcement, do you ever have any contact like that on the job? |
| Johnson: | Yes, I do. |
| Sternberg: | When was the last time something like that may have happened? |
| Johnson: | Last summer. |
| Sternberg: | Would you say—well, what happened in that case? |
| Johnson: | There was a gun placed in one of the caretakers lockers. |
| Sternberg: | You had to report that? |
| Johnson: | Yes. |
| Sternberg: | And you spoke to the police? |
| Johnson: | Yes. |
| Sternberg: | Not to go into any further detail but was there anything about that incident or any other contact that you have had with the police at all that would affect you in listening carefully to police testimony in this case? |
| Johnson: | No. |

*Id.* at 136-37 (Page ID #672-73).  The prosecutor did not have any direct interaction with Mr. Johnson.

In explaining his decision to strike Mr. Johnson, O'Connor said:

> [H]e mentioned that he had a nephew charged with assault and when he phrased it, the way he phrased it I had a nephew accused of assault, he was in a group of people someone was stabbed.  That indicated to me that he has a definite feeling about that situation, that his nephew was falsely accused, the phrasing of that statement and because of that I feel there was a possibility Mr. Johnson might have a disfavorable impression or opinion of law enforcement and of the criminal justice system.

*Id.* (Page ID #663).

In response, Sternberg argued that the prosecutor had not struck other jurors whose family members had been arrested, nor had he struck one juror who had himself been arrested. *Id.* at 150 (Page ID #666).  Indeed, a review of the record shows that the prosecutor did not challenge three non-minority jurors whose family members had been charged with crimes or who had faced charges themselves.  *Id.* at 23-24, 100 (Page ID #539-40, 615).  In each of those instances, the crime at issue involved DUI or minor drug use.  *Id.* at 150 (Page ID #666). Defense counsel further argued that Mr. Johnson's positive police contact through his employment should negate the issues raised by the prosecutor.  *Id.*  He reiterated his argument that the prosecutor failed to establish a race-neutral explanation for the challenge.  *Id.*

       d.      *Dain France*

Dain France, also a member of the second panel, introduced himself to the court with the following colloquy:

| | |
|---|---|
| The Court: | Mr. France. |
| France: | Married, Bayside, graphic designer. |
| The Court: | What does your wife do? |
| France: | She works for a credit card processing company. |

| | |
|---|---|
| The Court: | Any children? |
| France: | No. |
| The Court: | Level of education? |
| France: | College degree. |

*Id.* at 117 (Page ID #633).  During questioning about personal or familial conflicts with law enforcement, Mr. France volunteered the following information:

| | |
|---|---|
| France: | One of my cousins was charged with murder. |
| The Court: | Was that in this county? |
| France: | Nassau County. |
| The Court: | Was it resolved before trial or did it go to trial? |
| France: | Trial. |
| The Court: | Did you attend the trial at all? |
| France: | No. |
| The Court: | How long ago was this? |
| France: | About 20 years ago. |
| The Court: | Anything about that experience you think would affect you in this case? |
| France: | No. |

*Id.* at 99 (Page ID #615).  Neither the prosecutor nor defense counsel engaged with Mr. France directly during their times to interact with the jury.

O'Connor explained his decision to strike Mr. France by saying, "He has a cousin who was accused of murder in Nassau County, and, your Honor, I would not want anyone like that on this case."  *Id.* at 147 (Page ID #663).  Defense counsel conceded that this was perhaps the prosecutor's best argument, but reiterated that "there were other jurors on this case that have had

15

relatives or even themselves charged with crimes." *Id.* at 151 (Page ID #667). As the conversation turned to other jurors whose family members had been charged with crimes, the prosecutor interjected with a second reason he had struck Mr. France:

> In the break—if I could, referring to Mr. France, he also had a pen in his ear in the first panel. Before the break he had a pen in his ear and your Honor asked him to remove it because it was not very respectful to the court and that was another thing that played into my consideration not seating Mr. France.

*Id.* Defense counsel made no response to this given reason and instead continued the discussion with the trial judge as to another juror whose family member had been arrested.

> e.    *The Trial Judge's Ruling*

After hearing out the lawyer's arguments as to all four stricken prospective jurors, the trial judge issued his ruling as follows:

> In making the ruling of this nature, it is within the province of the trial judge to observe the demeanor and interplay that occurs in the courtroom during the trial to ultimately make my own factual determination as to whether I believe that the perempts have been used in a discriminatory fashion, and whether the excuses proffered are merely subterfuge to camouflage that or whether they are properly used as perempts.
>
> I do not believe that the reasons posited constitute a subterfuge. Miss Thomas based on her long term job at Rikers, the DA has a right to say he is concerned about despite assurances to the contrary he does not want her based on potential empathy. Mr. France, I didn't take his pen as any disrespect, but the concern about the cousin charged with a homicide in Nassau I think is a valid concern.
>
> With regard to Mr. Johnson subtleties involved and nuanced with regard to a response as to a relative charged with a crime, I don't interpret it as a subterfuge. Whether it's a cause or not is one thing, but that's why people have perempts and if Mr. O'Connor is concerned about that, that's what his perempts are for. Miss Chatman I noticed an unusual body language in the way she was sitting there. I simply don't believe Mr. O'Connor used this based on anything other than race neutral reasons. I think we have made a fair record on the issue and certainly Mr. Sternberg you have an exception to the ruling and preserved for the record.

*Id.* at 152-54 (Page ID #668-70). With that, the proceedings returned to selection of the jury.

2.    State Appellate Proceedings

On appeal, as it related to the *Batson* issue, the Appellate Division rejected petitioner's

claim as follows:

> The defendant's contention is unpreserved for appellate review
> with respect to two of the prospective jurors, since the arguments
> pertaining to them are based on grounds which were not articulated
> in the Supreme Court. In any event, the defendant's contention is
> without merit. The Supreme Court is in the best position to
> determine whether the proffered explanations for peremptory
> challenges are credible. The Supreme Court's determination that
> the explanations were nonpretextual is entitled to great deference
> on appeal and should not be disturbed where, as here, it is
> supported by the record.

*People v. Bowman*, 872 N.Y.S.2d 150, 151 (N.Y. App. Div. 2d Dep't 2009) (internal citations

omitted), *leave to appeal to the Court of Appeals denied*, *People v. Bowman*, 12 N.Y.3d 851

(2009).

## DISCUSSION

I now turn to a discussion of the challenges to each of the individual jurors, although I do

not do so in the order that the trial judge considered them.

**A.    Denise Chatman**

The prosecutor's strike against Ms. Chatman is the most troubling, but also the most

difficult to review from the vantage of a federal habeas petition.  The prosecutor stated that

"unlike the other jurors, when [the trial judge was] talking with the other jurors and instructing

them on the law and asking questions, she was not listening, she was looking around, perched on

the edge of her seat."  *Id.* at 149 (Page ID #665).  The trial judge noted that he had not

interpreted any of Ms. Chatman's responses as hostile—contrary to the prosecutor's claim—but

that he had noticed her "unusual body language."  *Id.* at 152-53 (Page ID #668-69).  After fully

hearing out defense counsel's arguments, the judge confirmed the prosecutor's observation regarding unusual body language and said he "simply [didn't] believe [the prosecutor] used [his challenge] based on anything other than race neutral reasons." *Id.* at 153 (Page ID #669).

The difficulty here lies in assessing factual claims on matters that simply do not—and, in all likelihood, could not—appear on the record. Bowman is correct that the prosecutor's strike here is not based "on anything that can be found in the record." Pet'r's Supp'l Mem. 19 (Page ID #1024); *see also Greene v. Travis*, No. 02-CV-6016 (JBW), 2003 WL 23198761, at *9 (E.D.N.Y. Dec. 2, 2003) ("The cold record does not indicate demeanor, pauses, emphasis, and body language."). He also cites *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992), a pre-AEDPA case, to argue that because such demeanor-based strikes are so susceptible to abuse, the evidence supporting them "deserves particularly careful scrutiny." But ironically, for this kind of demeanor-based challenge, precedent indicates that the trial judge should receive the greatest deference.

To clarify, there is nothing per se improper about using a prospective juror's conduct, demeanor, and body language as the basis for exercising a peremptory strike. *Brown*, 973 F.2d at 121. Moreover, the Supreme Court has recognized that the credibility determinations required to assess such strikes "lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to the trial court." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal citations omitted). Again, to quote from *Hernandez v. New York*, 500 U.S. at 365, "[t]here will seldom be much evidence bearing on [the credibility of the prosecutor's explanation], and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province."

I agree that demeanor-based strikes may be subject to abuse, particularly when it is not clear precisely how the basis for such strikes affect the juror's ability to sit. Nevertheless, as the New York Court of Appeals has observed, "[w]hether a proffered reason relates to the facts of a case or a prospective juror's qualifications is certainly a factor relevant to a court's determination of pretext, but, in our view, is not automatically dispositive." *People v. Hecker*, 15 N.Y.3d 625, 664 (N.Y. 2010). In the present case, the prosecutor focused specifically on the fact that Ms. Chatman was likely to serve as the jury foreperson, a fact that was critical to the exercise of the strike. Indeed, he acknowledged that, had she not been the likely foreperson of the jury, he may not have exercised the challenge. As the Assistant District Attorney representing respondent here argued, the foreperson "has to encourage deliberations and has to be a person who encourages the jury working together," and that "[a]ny juror who is uncooperative and especially the foreperson who has a somewhat leadership role, can result in a hung jury," which would be a victory for the defense. Oral Argument Tr. at 9, ECF No. 46 (Page ID #1111). She later added that the juror's potential role provided a "critical basis" for the strike "because it's a basis that can lead, as far as the prosecutor is afraid of, to a hung jury." *Id.* at 16 (Page ID #1118).

In sum, given the Supreme Court's admonition in a *Batson* context that "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner*, 562 U.S. 594 (internal quotation omitted), I am unable to say that the Appellate Division acted unreasonably when it upheld the trial judge's determination that the prosecutor did not strike Ms. Chatman based on her race. After fully hearing the defense counsel's arguments, the trial judge indicated on the record that he could confirm part of the prosecutor's physical characterization and that he believed the prosecutor's race-neutral explanation was the true reason for the strike. I have no

basis for concluding that the trial judge was lying in describing his own observations of the juror and his assessment of the demeanor of the prosecutor.

**B.      Norene Thomas**

The prosecutor said he struck Ms. Thomas both because she was uncertain about the resolution of her son's DUI case and because of her long-term employment on Rikers Island. Tr. 148 (Page ID #664). Defense counsel characterized the first reason as speculation, but when the trial judge pointed out that the prosecutor's primary argument seemed to be about the level of empathy a juror would feel given extensive contacts with the prison system, Sternberg replied, "Okay" and moved on to his argument regarding the next juror. *Id.* at 152 (Page ID #668). In contrast, the trial judge did not mention the first reason in his ruling, but said the prosecutor had the right to strike Ms. Thomas "based on her potential empathy" as a corrections worker. *Id.* at 153 (Page ID #669).

The petitioner's arguments with regard to Ms. Thomas fail for three reasons. First, the Appellate Division accepted the District Attorney's argument that, when petitioner said "okay" in response to the trial judge's observation that the peremptory challenge was based primarily on the juror's "potential empathy," it constituted a procedural forfeiture of the argument that the trial judge impermissibly rejected petitioner's objection to the peremptory challenge. *Bowman*, 872 N.Y.S.2d at 151. Second, passing over the issue of procedural forfeiture, at the third step of the *Batson* inquiry, after the prosecutor has articulated a race-neutral reason for the strike, the defendant has the burden of explaining why the prosecutor's "proffered race-neutral reasons were pretextual." *Hecker*, 15 N.Y.3d at 663; *see also Purkett*, 514 U.S. at 768. That burden was not satisfied by the petitioner's expressed acquiescence in the reason for the exercise of the strike. Thus, the result is the same whether petitioner's statement is characterized as a procedural default or a failure to meet his burden at the third step of the *Batson* analysis.

Finally, it is hardly clear that the trial judge's ruling on the merits was erroneous. The petitioner argues that the trial judge failed to make the required credibility determination. Pet'r's Supp'l Mem. 34 (Page ID #1039). This is incorrect. In fact, the judge said, "I do not believe that the reasons posited constitute a subterfuge," immediately before addressing the prosecutor's strike of Ms. Thomas. Tr. 153 (Page ID #669). A fair reading of the transcript indicates that the judge's statement applied to Ms. Thomas. Although the trial judge did not expressly credit the prosecutor's explanation for striking Ms. Thomas in particular, courts need not engage in "a talismanic recitation of specific words in order to satisfy *Batson*." *Messiah*, 435 F.3d at 198. In addition to the trial judge's clear statement finding a lack of subterfuge generally, the judge's explanation that the prosecutor had a right to be concerned about Ms. Thomas's potential empathy for the defendant implicitly credits the prosecutor's good faith in explaining his race-neutral reasoning. The prosecutor's good faith is further bolstered by his decision to strike Mr. Derek, a prospective juror who had participated in multiple volunteer projects involving prison inmates. Tr. 56-57 (Page ID # 572-73).

I acknowledge that the argument that corrections officers would necessarily have empathy for the prisoners and thus be disinclined to convict someone seems counterintuitive. Normally, law enforcement officers are assumed to be sympathetic to the prosecution and are not the kind of jurors who would survive the exercise of a peremptory challenge by the defendant, even where they assure the parties that their occupation would not affect their ability to be a fair and impartial juror. Nevertheless, there are reasons why, in this case, a prosecutor would strike a person who worked at Rikers Island. After all, the petitioner was housed at Rikers Island and one would not want a person who worked there to sit on a jury because of the possibility that they may encounter one another. Moreover, there is reason to believe that among the many problems at Rikers Island is the corruption of corrections officers, particularly those who are

responsible for smuggling drugs to prisoners. Michael Schwirtz & Michael Winerip, *De Blasio, at Rikers, Unveils a Place To Reduce Violence and Smuggling*, N.Y. Times, Mar. 13, 2015, at A22 ("While smuggling by visitors is a serious problem, city investigators say most of the contraband that enters the jails is brought in by Rikers officers and civilian employees."). Indeed, at oral argument, the Assistant District Attorney argued that corrections officers are "among the jobs that prosecutors look to strike." Oral Argument Tr. at 40, ECF No. 46 (Page ID #1142). She did not, however, want to "describe what the problems are with Corrections facilities people." *Id.* at 41 (Page ID #1143). She added only that it was "an attitude that we all have towards Corrections officers with a very difficult job" and that "[i]t's a closeness. Empathy is one word for it." *Id.* at 55 (Page ID # 1157).

In any event, because the petitioner acquiesced in the "empathy" explanation offered by the prosecutor, it is unnecessary for me to pursue this any further. I simply note that "[t]he government . . . is not required, when challenged, to persuade the court that its race-neutral reasons for striking jurors are valid or tactically sound; it is enough that they are the government's reasons." *Thomas*, 320 F.3d at 320. The trial judge here clearly credited the prosecutor's explanation as having been offered in good faith.

## C.    Troy Johnson

The prosecutor said that he struck Mr. Johnson because Johnson's description of his nephew's arrest indicated to the prosecutor that Johnson believed his nephew had been falsely accused. Tr. 147 (Page ID #663). Petitioner has since called this a "concocted scenario." Pet'r's Supp'l Mem. 17 (Page ID #1022). At the time, defense counsel objected to the explanation by pointing to other jurors whose family members had been accused of crimes, but who remained seated. Tr. 150 (Page ID #666). He further argued that Mr. Johnson's positive involvement with the police should negate any concerns the prosecutor harbored. *Id.* After

hearing out counsel's arguments, the trial judge credited the prosecutor's explanation, saying he did not "interpret it as a subterfuge." *Id.* at 153 (Page ID #669).

The petitioner's arguments on this matter appear to misapprehend the prosecutor's reasoning. The argument was not that the prosecutor struck Mr. Johnson because his nephew had been charged with a crime, but rather that his description of events indicated that he felt his nephew may have been falsely charged. Negative experiences with law enforcement, particularly the belief that a relative was falsely accused, constitute a valid race-neutral reason to strike a juror. *Isaac v. Brown*, 205 F. App'x 873, 876 (2d Cir. 2006); *Stays v. Herbert*, No. 01-CV-2400 (JG), 2003 WL 22765352, at *5 (E.D.N.Y. Nov. 24, 2003). Further, no other juror used comparable language. Whether the prosecutor correctly interpreted Mr. Johnson's comments and feelings is ultimately immaterial given that this was a peremptory challenge, not one for cause. Instead, the operative question is whether it was unreasonable for the trial judge to believe that the prosecutor actually acted for the race-neutral reason he articulated. In light of the deference owed trial judges in making such determinations, the petitioner's argument here are without merit.

**D.     Dain France**

The prosecutor first said he struck Mr. France because his cousin had been accused of murder. Tr. 147 (Page ID #663). While acknowledging that this argument was probably the prosecutor's best, the defense counsel pointed out that the prosecutor had not struck other jurors whose family members had been charged with crimes. *Id.* at 151 (Page ID #667). Before the judge expressed any statement as to the merits of these competing arguments, the prosecutor added that he had also struck Mr. France because he had been disrespectful in having a pen in his ear during the first panel. *Id.* In ruling, the trial judge stated broadly that he did not believe the prosecutor's explanations indicated pretext. *Id.* at 153 (Page ID #669). Although he said he had

not interpreted the pen as a sign of disrespect, the judge ruled that "the cousin charged with homicide . . . is a valid concern." *Id.*

There is no basis for finding that the trial judge acted unreasonably in determining that the prosecutor's race-neutral explanation was not a pretext. Having observed the entire voir dire proceeding and hearing out both the prosecutor's explanations and the defense counsel's objections, the judge found that the prosecutor was not acting from impermissibly race-based reasons. There is nothing apparent in the record to indicate that this was an unreasonable ruling. Although other jurors who were seated also had family members, or were even themselves, charged with crimes, no other seated juror had a family member involved with a serious violent crime. The other infractions related to DUI or minor drug use. This is a distinguishing feature that defeats the petitioner's attempts to draw an analogy among the various jurors.

Of more concern, perhaps, is the prosecutor's addition of a second argument—related to the disrespectful pen placement—to his reasons for striking Mr. France. As the petitioner points out, the Supreme Court has indicated that such additions can "reek[] of afterthought." *Miller-El*, 545 U.S. at 246. But the Court in *Miller-El* referred to arguments the prosecutor introduced after the trial judge had rejected a prosecutor's initial explanation. *Id.* That was not the case here because the judge had not yet ruled. Indeed, this secondary explanation came moments after the defense counsel had indicated that the prosecutor had just made his best argument. Tr. 151 (Page ID #667). The afterthought that was so obvious in *Miller-El* is not apparent here. Moreover, the trial judge was aware of the prosecutor's secondary explanation but nonetheless ruled that he did not find the reasoning to be a pretext for racial discrimination. While I would not credit the prosecutor's pen argument, I cannot find that the trial judge ruled unreasonably in crediting the

prosecutor's first argument as to the cousin's murder charge, even in light of the weaker second assertion.  Thus, the petitioner's claim here fails.[2]

_____

I have not ignored petitioner's argument that the trial judge erred by not taking into account the totality of circumstances when considering the prosecutor's peremptory challenges. Pet'r's Supp'l Mem. 11 (Page ID #1016).  Bowman is correct that a judge considering a *Batson* challenge is required to consider the totality of circumstances surrounding the challenged strike. *Martinez*, 621 F.3d at 109.  But the judge is not required to "make intricate factual findings" as part of its ruling.  *Messiah*, 435 F.3d at 198; *see also Guzman v. Duncan*, 74 F. App'x 76, 79 (2d Cir. 2003) (holding that there was no evidence that trial court failed to consider the totality of circumstances where court failed to mention juror comparison in ruling).  Indeed, the only real showing that the trial judge is required to make is that it allowed the parties a reasonable opportunity to express their objections and explanations on the record and that the judge ruled on the credibility of the explanations through a clear rejection or acceptance of the *Batson* challenge.  *Id.*  Here, the petitioner contends, "the trial court viewed the prosecutor's explanation for each strike in isolation, and did no more than uncritically announce that each particular explanation was either race neutral or not interpreted as 'a subterfuge.'"  Pet'r's Supp'l Mem. 11 (Page ID #1016).  Notwithstanding this argument, the petitioner has not shown that the trial judge failed to consider the totality of circumstances when ruling.  There is no debate that the parties here were able to make a full record on the relevant issues.  *See* Tr. 146-52 (Page ID

_____

[2] I observe that the Appellate Division accepted the argument that the objection to Mr. France had been waived because petitioner's trial counsel "began by saying that the prosecutor has articulated 'his best argument' for challenging [Mr. France].'"  Resp.'s Br. to N.Y. App. Div. at 13, ECF No. 17 (Page ID #234).  While counsel's statement supports the finding that the challenge was not based on race, it is not clear to me why it constitutes a waiver.  This is particularly so because immediately after making this statement, petitioner's counsel went on to reiterate that "there were other jurors on this case that have had relatives or even themselves charged with crimes." Tr. at 151 (Page ID #667).  Petitioner's counsel did not make any issue over the pen-in-the-ear prong of the Assistant District Attorney's explanation and, at least to that extent, the objection may have been procedurally forfeited.

#662-68).  Indeed, as the excerpt from the transcript quoted earlier at page 16 shows, the trial judge did not rule on the *Batson* objection to each juror until after the completion of voir dire of all the jurors and after both sides had made their arguments as to all four of the jurors in question.  The trial judge was certainly aware of the statistical pattern regarding the prosecutor's peremptory strikes of black jurors because he found that the petitioner had established a prima facie case at the first step of the *Batson* inquiry.  *Id.* at 146 (Page ID #662).  He was also certainly aware of the side-by-side juror comparisons given that the defense counsel highlighted those comparisons during the *Batson* colloquy.  *Id.* at 150-51 (Page ID #666-67).

## CONCLUSION

The petition is denied.  I grant a certificate of appealability with respect to the *Batson* issue.


**SO ORDERED.**

Brooklyn, New York
March 31, 2015                                   *Edward R. Korman*
                                                  Edward R. Korman
                                                  Senior United States District Judge